2023 IL App (2d) 220347-U
Nos. 2-22-0347 & 2-22-0276, cons.
Order filed May 3, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* THE MARRIAGE OF BRUCE D. HYMAN, | ) ) ) | Appeal from the Circuit Court of Lake County. |
|     Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 15-D-2205 |
| JOANNE L. HYMAN, | ) ) ) | Honorable Michael G. Nerheim, |
|     Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Trial court did not err in declining to consider anticipated future reductions in husband's income when setting maintenance, setting the date on which a reduction in husband's maintenance obligation commenced, requiring husband to contribute to children's higher education expenses as provided in the marital settlement agreement, and ordering husband to contribute to wife's attorney fees.

¶ 2   The petitioner, Bruce Hyman, appeals from the trial court's orders granting in part and denying in part his request to reduce his maintenance obligation, and granting the request for attorney fees filed by the respondent, Joanne Hyman. For the reasons that follow, we affirm.

¶ 3                           I. BACKGROUND

¶ 4    Bruce and Joanne were married in 1988. They divorced in 2016. All of their children are now over the age of 18.

¶ 5    Joanne is the director of operations for a Jewish adult school, and her yearly salary is about $100,000. At the time of the divorce, Bruce was the chief medical officer of Advocate Sherman Hospital and also owned a medical malpractice consulting practice. His gross income in 2019 was more than $750,000. As part of the judgment of dissolution, the parties entered into a marital settlement agreement (MSA) under which Bruce paid Joanne maintenance according to a formula designed to equalize their gross incomes. The MSA also provided that both parties would contribute to their children's college expenses "to the best of their financial ability" and would evenly split the college expenses of their youngest child.

¶ 6    In September 2019, Bruce experienced a ventricular tachycardia that caused a loss of consciousness and ongoing trouble with his memory and cognitive functions. Although he returned to work at Advocate in September 2019, he found that he could not sustain the increase in hours that occurred after the outbreak of the COVID-19 pandemic in March 2020. In June 2020 he took medical leave. Bruce was never able to return to work after June 2020. However, Advocate continued to employ him at his regular salary through the end of December 2020, when it terminated his employment there. Bruce's medical license and board certification lapsed as he could not complete the continuing education requirements, and he no longer can work as a medical consultant.

¶ 7    Bruce now receives disability payments from three private insurance companies and the Social Security disability program. His gross income from these sources at the time of trial was $357,708, with a net after-tax income of about $300,000. One of the private disability benefits will cease in December 2027, and the other two will cease at the end of January 2029. His Social

Security disability payments will switch to retirement benefits when he reaches age 67. Bruce's net worth at the time of trial was $148,381.80, an amount that included a recent gift from his current wife of a boat worth almost $60,000. Joanne's net worth in February 2021 was $1.8 million.

¶ 8    In September 2020, Bruce filed a motion seeking to reduce his maintenance obligation and his obligation for college expenses. The matter went to trial in October and December 2021. On March 3, 2022, the trial court entered a memorandum order summarizing the evidence presented and detailing its findings. As relevant here, the trial court found that a substantial change in circumstances had occurred. Although "both parties had left the marriage on an equal footing," Bruce had suffered a medical incident that left him permanently disabled and dependent on disability insurance benefits, some of which would cease in the years to come. Applying the statutory guidelines in section 504(b-1) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504(b-1) (West 2020)), the trial court reduced Bruce's maintenance obligation to $6,432.17 per month, making the reduction retroactive to September 2020. The trial court noted that maintenance would likely need to be recalculated in the future when the various private disability insurance benefits ceased, but it declined to calculate and order that reduction now because, apart from the anticipated decreases in those benefits, the parties' future financial situations were unknown.

¶ 9    As to the college expenses, the trial court denied Bruce's request to reduce his obligation, stating that "[i]f Bruce can find almost $6,000.00 for a down payment on a boat lift for his new boat and $79,000.00 to pay [down] his credit card bills,"—facts that had been established at trial—he can certainly meet the obligations he agreed to" in the MSA. Those obligations included about $7500 to pay off a loan for the parties' youngest child, and a different loan of $14,000 or less that

was currently in deferment and for which Bruce had applied for abatement on the ground of disability.

¶ 10    On April 4, 2022, Joanne filed a petition seeking Bruce's contribution to her attorney fees. The request was entered and continued.

¶ 11    Both parties filed posttrial motions. Bruce asked the trial court to set reduced amounts for his maintenance obligation that would take effect as his various private disability insurance benefits lapsed in December 2027 and January 2029. In a June 30, 2022, memorandum order, the trial court again declined to do so, stating that it did not have sufficient information to perform such a calculation because it did not know what the net income or available resources of the parties would be in 2027 or 2029. Joanne asked the trial court to clarify the amount Bruce owed for maintenance before and after September 2020, noting that, although Bruce filed his motion to modify in September 2020, he continued to receive his regular base salary from Advocate through the end of 2020 and received over $200,000 from his consulting company through that same time. Further, Bruce received an $80,000 bonus from Advocate for his work before June 2020 that was paid out in April 2021. In its June 2022 order, the trial court found that, given the evidence, the decrease in Bruce's maintenance obligation should take effect on January 1, 2021, and he should pay Joanne the portion of the 2020 bonus provided for in the MSA. In July 2022, Bruce filed an appeal from the trial court's March and June 2022 orders (appeal no. 2-22-0276).

¶ 12    Thereafter, Joanne filed an amended petition for attorney fees seeking $40,082.75. On September 2, 2022, the trial court granted Joanne's request for contribution to her attorney fees in part, awarding her $30,567.94. Bruce appealed that order as well (appeal no. 2-22-0347). The two appeals were consolidated for briefing and decision.

¶ 13                                II. ANALYSIS

¶ 14    On appeal, Bruce raises four issues, asserting that the trial court erred in (1) declining to consider known future reductions in his income when setting his current maintenance obligation, (2) setting the date on which the reduction in his maintenance obligation commenced, (3) requiring him to contribute to the children's higher education expenses as provided in the MSA, and (4) ordering him to contribute to Joanne's attorney fees.  We take each contention in turn.

¶ 15                          A. Anticipated Future Reductions in Income

¶ 16    Bruce initially argued in the trial court that, because he was permanently disabled and it was undisputed that his private disability insurance benefits would cease within the next several years, the trial court should immediately terminate his maintenance obligation entirely.  Failing that, he asked that the trial court reduce his obligation to a level below the statutory guidelines. The trial court declined to do so, finding that, despite these facts, guidelines maintenance was appropriate.

¶ 17    Bruce has not directly challenged that determination.  Instead, he argues that the trial court wrongly failed to apply the statutory factors in section 504(a) of the Act (*id*. § 504(a)).  He complains that, although the trial court applied the statutory factors in determining whether there had been a substantial change in circumstances so maintenance should be modified, it did not consider those same factors when setting the amount of the modified maintenance obligation.  He argues that this was tantamount to legal error.

¶ 18    Bruce's contention has no merit.  The trial court proceeded exactly as directed by the statute.  The threshold issue in any modification proceeding is whether the petitioner has shown a substantial change in circumstances.  *Id*. § 510(a-5).  In deciding this, a court must consider the nine factors set out in section 510(a-5) and the applicable factors listed in section 504(a).  *In re Marriage of Carstens*, 2018 IL App (2d) 170183, ¶ 30.  Once a trial court determines that a

substantial change has occurred and that a modification of maintenance is warranted, the next step is to determine the amount of that maintenance. For this step, it must apply the statutory guidelines unless it makes an express finding that that would be inappropriate, in which case it must detail its reasons for rejecting the guidelines. 750 ILCS 5/504(b-1)(1) (West 2020); see also *In re Marriage of Burdess*, 2020 IL App (2d) 190342, ¶ 16 ("the [statutory] factors are used to determine whether maintenance is appropriate, but the amount and duration of maintenance is calculated based on guideline formulas set forth in the statute"). When a court applies the guidelines, it does not reconsider the statutory factors.

¶ 19    Bruce cites section 504(b-1)(2) as support for the proposition that "[i]n determining the appropriate amount of maintenance, the court is to consider all relevant factors" listed in section 504(a). This argument is borderline frivolous and sanctionable, as section 504(b-1)(2) clearly states that it applies only if the trial court determines that guidelines maintenance is not appropriate. 750 ILCS 5/504(b-1)(2) (West 2020). Here, of course, the trial court applied the guidelines to determine the appropriate amount of maintenance, and section 504(b-1)(2) does not apply.

¶ 20    Bruce also seems to argue that the trial court abused its discretion in not setting his maintenance obligation lower, at a below-guidelines rate, because it is foreseeable that his private disability insurance benefits will end in 2027 and 2029. However, his income has not yet declined, and it is clear that Bruce continues to enjoy a high-income lifestyle with his current wife despite the decline in his income. Moreover, the guidelines require trial courts to determine maintenance based on the parties' current incomes. See *id*. § 504(b-1)(1)(A), (A-1) (maintenance "shall be calculated" using the parties' net annual income).

¶ 21    Bruce's argument that the trial court's ruling "unfairly imposes the burden of proof on him" at a later modification proceeding is similarly meritless. If, in 2027, Bruce's income is sufficiently

lower as the result of one insurance benefit terminating, Bruce may choose to file a motion to modify his current maintenance obligation, and if he is the movant, he will have the same burden of proof that all movants face. But there was nothing unfair about the trial court's maintenance determination (which, as we have said, was entirely in line with the law) or with its refusal to set future maintenance reductions based solely on the expiration dates of Bruce's disability insurance benefits years from now. Maintenance determinations require consideration of a host of factors besides the amount Bruce receives from private disability insurance. The trial court acted entirely properly in declining to determine, in advance and without adequate foundation, Bruce's future maintenance obligations.[1]

¶ 22                    B. Effective Date of Maintenance Reduction

¶ 23    Bruce next contends that the trial court erred in modifying its March 2022 order to provide that the reductions in his maintenance obligation should commence in January 2021 (when he stopped receiving salary and bonuses from his previous employment) instead of September 2020 (when he filed his motion to modify). However, in his written closing argument after trial, Bruce expressly asked the trial court to modify his maintenance as of January 1, 2021. It is well established that "a party cannot complain of error which that party induced the court to make or to

---

[1] Bruce also argues that the trial court's refusal to set future maintenance reductions now may hamstring his ability to prove a substantial change as needed for future modifications. But in fact, the trial court's express statements that it did not consider Bruce's future benefit expiration dates when setting the amount of maintenance serve as *protection* against this concern, because the statements make a record that the trial court did not take any future reductions into account. Bruce's ability to point to any future reduction in income as a substantial change is unimpaired.

which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004) (citing *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000) and *People v. Segoviano*, 189 Ill. 2d 228, 240-41 (2000)). Here, the trial court apparently overlooked Bruce's request that January 1, 2021, serve as the effective date for the modification when it entered its March 2022 order, and it simply corrected its error when it issued its June 2022 order. Bruce cannot now be heard to complain that the trial court set the date of modification that he himself requested.

¶ 24                     C. College Expense Obligation

¶ 25     Bruce also argues that the trial court erred in requiring him to pay his previously-agreed share of the children's college expenses despite his reduced income. As he acknowledges, "[a] trial court's decision to award educational expenses will not be disturbed on appeal absent an abuse of discretion." *In re Marriage of Thomsen*, 373 Ill. App. 3d 236, 243 (2007). A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11. Bruce argues that the substantial change in his circumstances makes it "impossible" for him to pay his agreed share of his children's educational expenses, which Joanne calculated in her motion for clarification total just under $14,000. But Bruce still receives more than $300,000 in after-tax income per year, and as the trial court noted, shortly before trial he was able to pay down his credit cards by $79,000 and buy an expensive boat lift, making a down payment of $6000. Given this record, we see no abuse of discretion by the trial court in requiring Bruce to pay his share of the children's college expenses.

¶ 26                     D. Attorney Fees

¶ 27     Bruce's final contention is that the trial court should not have awarded Joanne attorney fees. Joanne sought fees in three petitions for rules to show cause, which she brought because

Bruce did not pay her the sums required under court orders. Bruce argues that (1) she was not entitled to such fees under section 508(b) of the Act (750 ILCS 5/508(b) (West 2020)) because his failure to pay was not willful and wanton, and (2) the amount of the award was excessive and unjustified.

¶ 28    Section 508(b) of the Act provides that, "[i]n every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party." *Id.* "Thus, the court has no discretion under section 508(b) except to determine if the failure to comply with an order was without compelling cause or justification; if it so finds, attorney fees must be imposed." *In re Marriage of Putzler*, 2013 IL App (2d) 120551, ¶ 37.

¶ 29    Bruce first argues that the trial court erred in determining that his failures to obey his court-ordered obligations to Joanne were "without compelling cause or justification" because, as the trial court acknowledged, Bruce suffered a life-altering event that resulted in "the loss of many of the attributes that defined his life for decades." However, Bruce points to no evidence that he was in fact actually unable to pay his obligations or list Joanne as the beneficiary on his life insurance because of his medical condition. Instead, he simply rails at Joanne for failing to display "sympathy" for him and instead "piling on" with petitions for a rule to show cause. Our own review of the record shows that there was ample evidence supporting the trial court's determination that, regardless of the impact of Bruce's profound injury, he remained able to comply with the court's orders. Bruce has not shown that the trial court abused its discretion in making that determination. *Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 30 Bruce also contends that the amount of the fee award was excessive and unjustified. Joanne's amended verified fee petition sought $40,082.75 for the work required to bring her petitions for rule to show cause. The trial court reduced this amount, awarding her $30,567.94. Bruce argues (1) that Joanne should not have been allowed to amend her verified fee petition (which initially sought only $25,773.50), and (2) that the trial court did not provide any explanation of how it arrived at the $30,567.94 figure it awarded.

¶ 31 As to the first, Bruce's opening brief includes no citations, either to the record or to legal authority, to support his contention that the trial court should not have permitted Joanne to amend her petition to correct what she described as a clerical error. Thus, we could consider this argument to be forfeited. Where a party does not offer any argument or meaningful authority in support of that argument, the argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56. And although his reply brief cites *Charter Bank & Trust of Illinois v. Edward Hines Lumber Co.*, 233 Ill. App. 3d 574, 578 (1992), for the proposition that a party cannot contradict its own sworn statement in a verified pleading, Bruce fails to establish that the amended fee petition "contradicted" the initial fee petition in any respect other than the correction of errors. A trial court has discretion to permit parties to amend their filings. *Alpha School Bus Co., Inc. v. Wagner*, 391 Ill. App. 3d 722, 748 (2009). Indeed, generally the court should exercise its discretion liberally in favor of allowing amendments to pleadings if doing so will further the ends of justice. *Id.* Bruce has not shown any abuse of that discretion here.

¶ 32 As to the trial court's failure to detail how it arrived at the amount of attorney fees it awards, that "is not fatal to the award" of such fees. *In re Marriage of Powers*, 252 Ill. App. 3d 506, 510 (1993). Bruce's sole legal support for his argument is *In re Marriage of Gattone*, 317, Ill. App.

3d 346 (2000), in which the reviewing court reversed the trial court's grant of attorney fees. Bruce represents that the reversal was based on the fact that the trial court did not articulate its reason for granting fees, other than saying that it was because of the husband's failure to comply with a court order. However, a reading of *Gattone* discloses that this argument lacks merit. Although the lack of further explanation made the trial court's decision more difficult for us to review, we reversed for entirely different reasons: that the trial court had not found that the husband's noncompliance was without justification, and that the record suggested that the court awarded attorney fees for other work beyond the wife's efforts to enforce the court's orders. See *id*. at 359-60 (finding the statutory requirements for an award of attorney fees under section 508(b) had not been met). Neither of these are the case here, making *Gattone* inapposite. Accordingly, we affirm the trial court's award of attorney fees.

¶ 33                                         III. CONCLUSION

¶ 34     For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 35     Affirmed.